Good morning, Your Honors. I'm Alexandra McClure, and I represent Appellant Michael Swanson. Just a little housekeeping. I gather you're splitting arguments 10-10. That's correct. I will give each of you a chance to rebut, but I'm going to be fairly strict on time on this one. So save your time for your rebuttal. Save your time for rebuttal. Okay. Wonderful. Thank you for that admonition. Your Honor, I think the legal issues in this case concerning the errors of Mr. Swanson's trial are fairly well set out in our briefs, and I think that the law is not really in dispute in this case. And so what I'd like to spend my time doing today is focusing on the ways in which the multiple errors that occurred at Mr. Swanson's trial prejudiced him. I'd like to focus on that analysis. And the reason for that is when I was reviewing the briefs again and looking over the record, I think this is a case in which all of the errors really affected Mr. Swanson in substantially the same way. They went to the same theme, and that's why the cumulative error analysis is so important in this case. Because if you parse out every error, as the government does, it's easy to say that each individual error is somehow immaterial. But, in fact, every error in this case created the impression that Michael Swanson had full knowledge of what was going on with these companies and that he knew about the fraud being committed by Barbara Alexander and Beth Pina. And so these errors really had almost an exponential effect. In each instance where the government presented improper evidence or improper arguments, that overreach made it appear that Swanson knew far more than he did. So just to dive right in, the first error I wanted to talk about, the prejudice, is the Rosemond error, the instruction on aiding and abetting. I won't belabor Rosemond. I know the Court's well familiar with it. But, of course, the hallmark of Rosemond was the notion of advanced knowledge at a time when the alleged aider and abetter can withdraw or can walk away, make the legal or moral choice, in the words of the Supreme Court. And so by failing to instruct the jury that Mr. Swanson had to have that foreknowledge, he was able to be convicted based upon knowledge that he learned much later. And I think to apprehend how central this aiding and abetting theory was to this case, one only need read the government's closing argument where the aiding and abetting theory was really argued over and over. There wasn't a single count. In fact, the theory for all of the substantive fraud counts and, by extension, the conspiracy count, count one, was aiding and abetting. So I want to just highlight a few false statements by Alexander and Pena that Swanson did not know about, that Michael Swanson didn't know at a time when he could make the choice not to be a part of their enterprise. There's one that I don't know that I highlighted well enough in my brief, and I just want to bring it to the Court's attention. It's at SER 992. It's a concrete example of a spreadsheet, a deceitful spreadsheet provided to Michael Swanson by Beth Pena. The number one entry on this spreadsheet is a rather large loan to Cook, which is a construction business, secured on a first deed of trust by $1.5 million. The loan is for almost $900,000. At the bottom is an email from Michael Swanson asking about this. He has questions about why the points are low. He wants to make sure that the fund is going to make enough money from this particular loan. We know from the trial testimony that, in fact, that was a fraudulent loan. That was straight-up looting of the funds by Pena and Alexander. And so, again, this is a fact that he didn't know about, which is then later argued to the jury as if he had the knowledge. And there are numerous examples. There are, as we know, Pena testified that Swanson didn't have access to the books. He didn't have access to the financials. He, in fact, couldn't go in. He didn't even know the passwords. And that these financial statements that Swanson would receive, many of them were actually falsified by Pena. She admits that. We know that the true status of all of the loans, the true status of the actual looting of these funds, was not revealed to Mr. Swanson until 2010. He doesn't know that Barbara Alexander is investing money in a taxi business in Jamaica. He doesn't know that Pena has falsely booked certain expenditures as a loan to a false person, someone named Swanson. And so here he is trying to raise capital. He's trying to get lines of credit. He's trying to weather the downturn. We know it is happening. The real estate market is falling apart. He sees problems, and he's trying to fix it. So he invites an audit. He has oversight from attorneys, from accountants. He's working with banks. We even know that Wells Fargo was reassuring Michael Swanson, this is temporary, we'll be back, putting capital into your area. Is it your argument that Mr. Swanson at no time took any money out of any of the three or four companies, investment companies, for himself? No, Your Honor, that's not my argument. The amount that was taken was the amount, the government's chart, and I'll get to the charts later, but in the government's chart that the jury had, it showed about $360,000 over a three-year period. Looking for it, yes. Which is about $10,000 a month, which is what he had negotiated up front as his compensation as a business consultant when he came on. Verbal negotiation. Is this a verbal agreement or a contractual agreement? I believe it was contractual, Your Honor. I believe he was entitled to that money. The question then becomes, and this is where it gets tricky with the operating agreements, was he allowed to take a salary? Was he allowed to take his income as a business consultant? I would argue the operating agreements actually do allow for that. I think it's 5.2, Section 5.2 of the operating agreement allows for that. Now, of course, that's not the advice Michael Swanson got. His accountant told him, no, no, you need to record these as loans. And so that's what he did. He changed it and he recorded them as loans. If I'd been giving him advice now that I've read this, I probably would have told him, I think you are entitled to some compensation for your managing of these funds over a three-year period. We have millions going to Barbara Alexander. This is a small amount of money. And, again, foreknowledge is what's key in the Roseman analysis. What did he know about the true financial health, the true status of these funds, when we have the two principals deceiving him, and then he can be held liable as an aider and a better. The portrayal is very, very negative. It's as if there was a piggy bank there and everybody was helping themselves of investor money. Right. That's the portrayal of the government, and that's why I believe the charts were so very prejudicial. I think the error of admitting charts that were not actually summaries, they constituted all sorts of information that we know Beth Pina falsified. Did anything more than a flow chart? I mean, it was just money was here and it moved over there. It's not necessarily conclusive. It was just to show the flow of money and who was doing what. Your Honor, I respectfully disagree. There's a chart that I'm trying to find right now, but it lists several payments. As if Michael Swanson would have had the knowledge that the money was going to those individuals, to Gold Coast, to Barbara Alexander, to Money Dots. There's another one that is escaping me at the moment, but it's as if he knew that, when in fact the testimony of Beth Pina was that he thought the Cook loan was a legitimate loan. He didn't know that that almost million dollars was actually going into Barbara Alexander's pockets. So the chart was very misleading. I don't think it was simply money in, money out. It was actually characterizing payments in a way that greatly prejudiced him because it is not reflective of his knowledge at the time. You say characterized. It only stated, if I remember correctly, a very specific fact of where the money was and the movement of that money. If I remember correctly, that's what it did. It lists entities, Your Honor. Why can't I find it? But I don't recall characterizing. Well, there, no, because the charts list the true entities that the money was going to. My point is the information Michael Swanson was receiving was not that. He was receiving false information, cooked books essentially, until it was too late for him to make that relevant choice to not be a part of it, to walk away. He may have been overly optimistic, foolishly so, and I think that can be said of probably thousands of people, at least in California real estate and probably throughout the country where some places are still underwater. He thought he could turn it around. And remember, he's the one person in this business of the three of them who invested his own money and his family's money. And you see it in his emails that he's trying to fix it. He's trying to correct mismanagement, and that's not the same thing as fraud. That's not the same thing as fraudulent intent. The puzzle argument I want to just touch on briefly, I think. How am I doing on time? I'm okay. Well, you've got one minute left. So I had better stop. Okay. Why don't you stop now? I'll reserve the rest for rebuttal. I think we understand the puzzle argument, so why don't you. Okay. Let's let your co-counsel go, and then you will have some time for rebuttal. I appreciate that. Thank you, Your Honor. Thank you, Your Honor. Please, the Court. My name is Roger Teich. I represent Barbara Alexander and the appeal. I'd like to talk about the emails, the private emails from Michael Swanson to Beth Pena that were used against Barbara Alexander at her trial. That's a claim, too. And to make three points about these. There is no shared purpose between Michael Swanson and Barbara Alexander in these emails. She's not CC'd in these two emails. Why? He writes, we have to choose between Barbara and the investors. In the second email, he writes, she didn't get my approval. Had I known, I would have objected. That sounds like two against one. That doesn't sound like, you know, one for all and all for one. Simply, these are plainly not in furtherance of a common scheme. The second point is that these are testimonial. He writes, Mike Swanson, in the first of these emails, these private emails, we haven't seen the last of litigation due to Barbara's actions. What do you make out of this testimony that Barbara, your client Alexander, took a very large sum of money out of these investment funds to remodel a kitchen? Several hundred thousand dollars, if I remember correctly. And is it your argument that this is a proper withdrawal of investment money? My argument is that the crux of her defense is that she relied on Michael Swanson and that he was the one who drafted the agreements and he was the one who consulted with attorneys. What has that got to do with withdrawing several hundred thousand dollars and remodeling a kitchen? Well, that she was permitted to make related party loans without security. He was permitted by what? By the rather spacious language of the operating agreements that said a managing member can make a related party loan, a loan to another member or to herself as a member, without security. So she authorized herself to take a loan out to remodel her kitchen? That's right. And I think, you know, I can see your discomfort with that fact. But the jury, I think, struggled with the fact that, you know, you've got operating, you've got language in the operating agreement that seems to permit that. And I think that's why the jury in two questions, jury note five, and then the one by the individual juror said, does the language govern? They're only, I think, asking that question is only relevant if the language permits this or one would have a reasonable doubt whether Barbara, not having drafted it and not having consulted with the attorneys, you know, a reasonable doubt as to whether she felt she could use the money in that purpose. And I think Beth Pena testified that Michael Swanson said that related parties' loans were permitted. So, you know, the point with the e-mails is just that she should have had a chance to cross-examine Michael Swanson. Beth Pena is testifying. He said that this is permitted. He's not testifying. How could that have happened? He was a co-defendant in the case. Well, he's tried beforehand. He is unavailable, for sure. And the jury is not allowed to speculate why he's unavailable. What I'm saying is what shouldn't have happened is what did happen, is that the government puts in a trial by absentee witness. He's saying in these e-mails, I didn't approve this, I would have objected had I known. He's saying we haven't seen the last of litigation due to Barbara. This is testimonial. And you don't have to take my word for it. In his trial, separate trial, the government said these are the only or this is the only e-mail he, Mike Swanson, thinks the jury is going to see. You know, this is a problem. And I think the ---- Here's my problem. As I read those two e-mails, they look to me very much like they're self-serving and in anticipation of litigation, Barbara's the bad person, I'm the good person, I'm trying to bail us out here. My problem is we're reviewing for plain error because there was no objection. Yes. And, you know, and my problem is I don't sit up there, so what is a plain error? I know when I'm reading these and there's a welter of e-mails, these leap out to me because I'm kind of looking at these and I'm like, why doesn't she respond to that? And then the answer is because she didn't have an opportunity. And I think, you know, so in other words, as a ---- There was no opportunity to object or no? She never received them. The first time she saw them was when they were coming out on the witness stand. Well, understandable. Why was there no objection to their admission? I, that's ---- That's the plain error problem. Right. No, and that is a problem. But I think ---- And plain error is a misleading label because it needn't merely ---- for it to be plain error, it's not sufficient that it's plain error. Right. Meaning there are further requirements about injustice and all kinds of other things. And let me speak to those. When I say it's ---- I think this is plain error in the sense of obvious. Yeah. Well, that's certainly ---- But you need more than that. Right. Well, I would start by saying it leapt out at me, but I would go on to say, and this is why I think this is an unusual case. You find this to be plain error, it doesn't open the floodgates in business cases to e-mails. Because the government categorized the truth value of these differently in the two cases. In Mike Swanson's case, they said, you know, this is clearly self-serving, it's the equivalent of wiping his fingerprints. In Barbara Alexander's case, the government said about these same e-mails, you know, they're calling her the mastermind, he's trying, you know, he's trying to get truthful information from her, something like that, as if these are a true organizational chart, you know, that she's ---- and that's not fair. And that goes to the integrity of the proceeding against Barbara. Just briefly, I think the sentencing is a problem here. She's given two points for a special skill, which is a radio talk show host. You know, the government says that's in the private placement memo, and it is. But so is the fact she worked as a success, a private success coach. I mean, I was a radio talk show host. It's not a special school skill relevant to the fraud. Nobody relied on it. Why does it ---- I think the fraud number used for Barbara of 6.3 million is a throw-a-dart number. It excludes repayments in 2006. Ill-gotten gains would be a better number and would reduce the total by two points. Why does it matter? I think the equities have shifted since she was sentenced. She's over 70 in ill health. If we could get to half of her term served, I think there's a case for a compassionate release, which is not a ground for reversal, but it matters. Okay. Thank you. And you both will have some time for rebuttal. Good morning. May it please the Court, my name is Mary Jean Chan, and I represent the United States in these two appeals. This Court should affirm. I'd like to start off with the aiding and abetting instruction, which are actually raised by both defendants, although only argued today by Swanson. The aiding and abetting instructions given in these two cases were correct. The district court instructed the juries that they had to find that the defendants had intent as to every single element of the crime, whether that crime was wire fraud, mail fraud, or securities fraud. That perfectly comports with what Rosman says. Rosman requires that the intent, as opposed to the affirmative act, in aiding and abetting liability, go to the entire scope of the crime. In that case, because it was what is a so-called two-barreled crime, we had a situation where it wasn't clear that the defendant knew that in engaging in the drug trafficking, that a firearm would be used in furtherance of it, which was required as to the 924C. That wasn't a situation that was pertinent in this case. And, in fact, Rosman specifically addresses mail fraud in the decision. The Supreme Court said that it was sufficient as to intent if a person knew that some confederate would be doing the mailings. It's clear in this case that there was evidence that Swanson, in fact, did have that knowledge. He was integral to the operations of APS almost from the beginning, even before he started as a vice president in 2008. And the current model instruction, 5.1 of this circuit, says that special instruction about foreknowledge is only required if, as in Rosman, there is an issue as to when the defendant learned of a particular circumstance. And that issue simply wasn't present in the Swanson case. I'd like to also now move on to the bank record summaries argument. And the bank record summaries in this case, in actually both cases, were properly admitted. I'd like to only focus on the Swanson case, since Alexander hasn't raised it at argument. The 219 series, to begin with, were harmless, even if there were some issue, because the defendant, Mr. Swanson, simply didn't contest the accuracy of these charts, the money in, the money out, between 2007 and 2009. In fact, his argument at trial was, had he known what was coming in, what was going out, if he had known what Campagnolo did, then he might have realized that there was a fraudulent scheme at hand. But because he didn't have all the access to the bank records that were summarized, because he wasn't controlling the QuickBooks records, he did not have the intent to defraud. So his dispute was never with the accuracy of these flow sheets or these summary charts. And, in fact, they were proper summaries under 1006 of the rules of evidence, because they summarized voluminous bank records, and they only reverted to or referred to the QuickBooks records for the purpose of identifying certain individuals identified in the bank records as either investors or borrowers, as treated by APS itself. The QuickBooks records were also admissible. They were admissible both as co-conspirator statements, as well as business records. And they were certainly reliable as business records for that purpose, because the Ponzi scheme itself relied on an accurate tallying and record-keeping of whom was giving money into the operation and who was getting money out of it in order to keep it afloat. So there was really no issue with respect to the reliability. And there was no expert testimony in simply looking at whether somebody was looked at as a capital or treated as capital and calling that an investor versus a short-term loan as a borrower. Swanson also notes that he refers to the government's Excerpt of Record 992, an email or a spreadsheet that was sent in May 2007. And I think it's important as evidence that Mr. Swanson didn't realize what was going on and that he really had no intent to deceive. The government believes that there were arguments made at trial that were rejected by the jury as to Mr. Swanson's intent, and that the evidence actually goes to all the way back probably from 2006. But the fact is there's a lot of other evidence post-May 2007 that is particularly strong as to Mr. Swanson's intent to deceive and his participation in the scheme to defraud. In January 2008, again post-dating May 2007, Mr. Swanson engages in these discussions with Wallace Groves who testified at trial about trying to get a warehouse line of credit. Mr. Groves specifically says that the way the loans are going out, the intra-party, the related party loans are suggestive of a Ponzi scheme, and that warehouse loan line of credit will not be extended. In March 2008, he arrives on scene as vice president. Let me ask you this, were there documents that authorized Ms. Alexander, I think, to take out loans from the investment trusts? Is she authorized by an agreement of some sort? I don't believe that there is evidence that she is. I know that Ms. Alexander argued that because the operating agreement said that she had discretion in how to loan money out, that that allowed her to loan herself money. But in fact... Is it verbal or written that said she could take out loans? The operating agreement is a written agreement, and the agreement, what was sort of subject to dispute was the language within that agreement that authorized her discretion in how to use and invest the money. But the agreement also very specifically said that all the investors' money was going to be going towards real estate loans that were going to be extended at percentage rates that were higher than 12 percent, and that the spread between the 12 percent, that would be then paid back to the investors as an interest. And what the APS entity was going to be getting was how APS itself was going to make money, and that all the principals would not receive money until the 12 percent had first been paid out. That was clearly not how the business was operated. In fact, they took the money in and they used it on themselves, and it was Mr. Swanson who came on the scene and said, well, we can't actually take them as salary. Let's call them loans. They might not be loans, and certainly the evidence showed that there was really no intent to ever pay back these quote-unquote loans. No payments were made back. Mr. Swanson did do some transactions after the FBI search in 2010 to pay back his portion, but nobody else paid back, and there were no payments prior to that time. Can we talk about the e-mails that were introduced against Ms. Alexander, the two e-mails sent by Mr. Swanson to Ms. Pena? Because it does seem to me that those are quite damning, and they sure read to me as though he's setting up Ms. Alexander as the bad person and that he's the innocent guy trying to clean everything up. It's the only way I can read them. Okay, yes, well, I think that the setting up to be the fall guy is certainly the way that she has portrayed it, and in fact that's how the government also portrayed it, which is why those e-mails were not entered for the truth of the matter. In the trial against Alexander?  What was the purpose? The purpose was really to show kind of the fact that there was, it came in, let's say, through Pena's testimony, and Pena talked about how she had had concerns, and she had raised these concerns in May 2009, and that really then Swanson then tried to lull her and say, well, I'm on your team, which was really his role in all of this. He was the one who was the good guy who told investors their money was safe. He was the one who told Pena, don't worry about things, things are okay, we're going to go forward with this. Yes, Alexander's a problem, but we'll continue and forge through. I'm still not sure I understand the permissible purpose for which they were introduced. Well, they were relevant as to the scope of the conspiracy. This was showed during the scope of the conspiracy. This was in May 2009, the first e-mail, and the second e-mail was in March of 2010. So as to the first e-mail, this was clearly during the conspiracy. They still took millions of dollars after this, and they really talked about how to manage this and how to get things under control. So it was part of the conspiracy and how it kept afloat for as much time as it did. So it was relevant to show the scope of the conspiracy, which is count number one. And it was not, I think it's also very important to resist, I would like to resist this idea that it's plainly or obviously testimonial, which is required for under their claim of the Confrontation Clause. It's not testimonial simply when somebody, a defendant, anticipates that maybe at some point somebody will be looking at his or her e-mail and that they want to make a good face of it and maybe do some scapegoating, even if that's really the purpose of it. The Court has been very clear that the core class of testimonial statements are ones where individuals are making statements to officers, there's some sort of legal process already at hand that's incipient, that an objective witness looking at something would say, yes, this is going to be prepared and admitted probably for litigation. Here an objective witness is looking at an e-mail between one partner to another partner in a business, talking about how they don't have money and a third partner is maybe a troubling factor and how they're going to manage this and cope with this and go forward with this. So I don't think it falls within the testimonial class of statements and it certainly doesn't plainly do so. So I would argue that that's not, because of that it doesn't even meet the first factor of it being an obvious error. And I don't think that this Court should find that it is either in the first instance in this case, because again, this is an e-mail during the course of a conspiracy between one conspirator, one co-conspirator with another co-conspirator talking about how we need to get a game plan together because we are lacking money, we need to get the money together and maybe our co-conspirator, Ms. Alexander, is a hindrance. That is not testimonial in the sense that Crawford is really talking about and this Court should not so find in this case. Not only was it not testimonial, it was not hearsay because, as I said, it was a co-conspirator statement. Now, it might not be a co-conspirator statement in the sense that it's not Alexander's statement or Alexander might be sort of out of it, but it's a co-conspirator statement. They're co-conspirators. And it's to further the conspiracy, if you take it sort of at face value that they believe that Alexander is at this point actually a threat to the Ponzi scheme because you have to have some money to be able to keep the Ponzi scheme afloat so that she's a threat and so that they're trying to figure out how to keep the conspiracy, not necessarily the co-conspirator happy, but the conspiracy that they've all agreed and entered into afloat. And again, it was not for the truth of the matter. Again, the government and Alexander, neither parties ever treated the statements in these as true. Now, I'm talking now particularly addressing the March 2010 email, the Exhibit 181, the second email. That's sort of distinct. I think it's still arguable that it was a co-conspirator statement in furtherance of the conspiracy, but there's also an argument that maybe it's not since the FBI had already engaged in its search in December of 2009, a few months earlier. But nobody is treating this as true. The government is treating this as basically Swanson trying to cover things up because he wants to have a fall guy. Alexander is pointing to this and saying, look, he's the mastermind. They're cutting me out of all of this. He and Pena are engaged in conversations. I don't know anything about it because he's the mastermind and he's trying to blame me. So neither the government nor Alexander in this case were treating it as true. And it has to be treated as true in order to be hearsay and for the Crawford to apply. So there was no plain error on that count. And the operating agreement's jury answer to Note 5 I think was absolutely correct. It was Alexander's contention that because the operating agreement's language maybe allowed her to do what she did, that she had no intent to defraud. But that was the issue there was what was her intent, not whether it was actually a valid agreement under California law or how you would interpret it under civil law. There was no evidence during trial at all about those issues. And so it was absolutely proper for the jury to be instructed that that was not something that they need to look at and to advert to the jury instructions which indicated that they need to think about her intent and to follow those instructions. With respect to sentencing, the loss amount was correctly calculated. What Ms. Alexander argued for was that the gain, according to Chart 219, which was the gain that was only a snapshot from 2007 to 2009 be used. The guidelines 2B1.1 specifically state that gain should not be used unless you cannot reasonably estimate the loss. In this case, the government was able to provide a reasonable estimate of the loss. And it was a loss that was more comprehensive than the snapshot that was presented at trial based only upon bank records. It was from 2006 through 2009, the entire scope of the conspiracy that was charged. And what the government did was it took all the people that had been fully made whole and took those people out. And they looked at all the people who were left, who had invested money, who had been paid something, but maybe not everything, and tallied up what they had not been paid. That was also the same thing as the restitution amount, which, incidentally and importantly, Alexander does not challenge. So there was no error in the use of the 6.3 million amount as the loss. And in any case, even using a lower amount would still be above the 2.5 threshold. And then finally, let me address quickly the abuse of trust enhancement. In this case, the district court found that Ms. Alexander both abused her position of trust. She was the CEO of APS. She had a lot of discretion. She was not simply an employee who took orders. She was the one who made the decisions. As well as her special skills of being a broker, a real estate broker, to really further this fraud. And there is ample evidence for this finding, these two findings. She was a broker, and she touted this not only in the private placement memorandum, as well as her MoneyDots position as an authority for 20 years on the radio, telling people what they should be buying. And MoneyDots, the radio station, how, what evidence was there in the record that any of the investors were aware that she was on MoneyDots, and that that influenced their decision to invest. So I believe Cagle testified that she knew that Ms. Alexander ran MoneyDots, and that she believed that she listened and read all the books for all the people for all those years who had been on the show, and therefore she had extra expertise. Mr. Goff, who invested, knew her not only as a mortgage broker, sorry, a real estate broker, he was a mortgage broker, through that experience, but also the fact that he worked with her through MoneyDots, he sponsored her line, that those factors went into her, his decision to invest with her. They were not the only things, but it was something that she used. She touted these things in the private placement memorandum. Barbara Workman indicated that she was a little skeptical about this deal. She didn't have a lot of experience investing, but she was a little skeptical. And then Barbara Alexander talked to her about it and assured her and said, I have a lot of experience in real estate, I'm a real estate broker, and that this helped assure her that since all the investments were going to go into real estate, that she could trust Alexander. Do we have any cases that say the position of being a real estate broker is one that has special skills that would support the abuse of trust enhancement? Your Honor, I don't have one at the tip of my fingers, and I'm not sure if there is one specifically, but the guidelines say that it has to be a special skill, and it doesn't limit it to the special skills of being a pilot or something other than that. Usually it's some kind of specialized training or, you know, advanced degree or something. True, but brokers have to have something that's quite specialized as well, which is that they have to take a test that puts them beyond just a simple salesperson. And this Court, and again, I apologize for not having the case names at hand, has also talked about individuals who maybe just have a lot of experience or expertise in a special area, like a hacker, for example, a computer hacker. That might be a teenager, for example, who doesn't have advanced degrees, but really knows how to hack and can do something that other people can't do. Not everybody, in fact, very few people run radio shows that are syndicated for 20 years that advise individuals about how to invest their money. That puts somebody in a position that is, I think, probably more than somebody who can just say, you know, I have an MBA, listen to me. It's somebody who is really treated as an authority. She's treated herself that way, and she put herself forth that way, and the District Court did not abuse its discretion. And I should also incidentally note that this is reviewable under plain error again because Ms. Alexander did not object to it at trial. If the Court has no other questions, I would ask for an affirmance in both cases. Thank you. Thank you. Now, why don't we give each of you two minutes each for rebuttal. Thank you, Your Honor. Okay, on the plain error thing, I don't understand the limited admissibility argument. The USA says you'll have all the e-mails with you in the jury room. There's no limiting instruction. They go back with those e-mails. I think I did raise a IAC failure to object just to say it because I can't come up with a reason not to object to this. And I think on the four corners of those e-mails, they're terribly damaging. I don't have a new case, but I have an old case, Dutton v. Evans, 1970. In that case, the statement is, you know, we wouldn't be in this mess if it weren't for Evans. And the Supreme Court, you know, affirms admission on 5-4, but the fifth vote is Justice Harlan saying, you know, it's kind of a summary statement, it's not an express assertion. In fact, there's indicia of reliability. There's no indicia of reliability to this, and it's very express assertions of fact that he wouldn't have approved these loans. As to the authority, I mean, she's making a loan. How she uses it doesn't look good. She's remodeling the house. But the legal point is, was she authorized to make a loan? Could a juror have had a reasonable doubt about that? At least one juror did because they hung out for three days. And the language in the written operating agreement is that 5.2G of the operating agreement, she has discretion to loan money without security to herself as a member. The issue is whether the jury needs to consider that language or it's been voided. That's the question. The answer the jury should have been given is you have to consider all the evidence, not the enforceability of that contract is not before you. The other thing I would like to point out is that there is a case, I think an unpublished case, Kelo, that the USA used for the use of a mortgage license. But in that case, he falsified mortgages. That's not this case. Thank you. Ms. McClure. Thank you, Your Honors. Briefly, the — with respect to the Roseman issue, the government's argument that that instruction only matters in a case where there's actually an issue about when the aider and abetter had the knowledge, the full knowledge of the scope of the fraud, I would submit this is exactly that case. He didn't know the full scope of the fraud until 2010, and that's the testimony of the government's witness, Beth Pina, who admits that the secret document, which is that excerpt of Record 124, was not shown to him, which has the breakdown and shows all of the fraudulent loans. Regarding the government's comment that Wallace Groves of RBA Capital told Michael Swanson this is a Ponzi scheme, I urge the Court to carefully look at the record. That's not what he said. He did have concerns, and then Michael Swanson expressed concerns to the others and assured him that going forward there wouldn't be noncompliant loans. That's when he starts making changes and trying to correct mismanagement. Finally, with respect to the puzzle argument prejudice, because I didn't get to it and I don't think I did it well enough in my reply brief, I think what's so important about that argument is that it lessened the burden of proof and it was — and the standard of reasonable doubt was then incorrectly presented to the jury exactly on the issue that the defense had argued. Counsel, how did it lessen the burden of proof? Because an identifiable object, such as a map of the United States, is a thing that is a certain — I'm sorry. No, go ahead. Mr. Swanson's guilt is not a certain thing. The jury needs to decide that. And so to say, well, don't worry about these missing emails, don't worry — because that's exactly what defense counsel argued. He said, where are the emails showing his proof of this fraudulent attempt? Let me just ask you, don't our cases say in the jigsaw puzzle analogy that it's reversible error if it's quantified, if there — you know, if a number is put on it, like there are 100 pieces and you only need 92 or a certain number? But just globally using a jigsaw puzzle analogy has not been grounds for reversible error. Without some additional attempt to quantify. I — Your Honor, that's a good question. And I don't recall the cases that way, actually. I think there was a mix. And I'm trying to see if I can find one quickly, for Your Honor. But I recall cases where it's — the issue is not so much the government arguing how many pieces are missing, but the fact that the government is even saying, you can just ignore that we haven't entirely proved our case because look, you can still tell it's California, or you can still tell it's Abraham Lincoln. That's a known fact. That's a familiar object. Mr. Swanson's guilt sure isn't. It's entirely up for decision. So my reading of the cases, and I don't — I think it's Centennial — well, there are several in my reply brief. But I would urge the Court — I don't think I'm wrong on this. I truly think that there were cases where it was simply the familiarity of the object and then the argument, you can just ignore this evidence. And that lessens the burden, which is beyond a reasonable doubt. Thank you very much, Your Honors.
judges: Fuentes, W. Fletcher, Rawlinson